[No. 2037.]

## THOMAS HOLMES *v.* THE STATE.

20  509
31  209
32  183
32  229

i 20  509
f35  212
36  124
36  127
37  623

1. PRACTICE — PLEADING.— PLEAS OF FORMER CONVICTION AND FORMER AC-QUITTAL are the only special pleas available to a defendant in a criminal cause under the Code of this State. (Code of Criminal Procedure, article 525.) The plea to the jurisdiction of the court and the plea of former jeopardy are special pleas available to the accused as a constitutional and not a statutory right, and because they are fundamental, and beyond the power of the Legislature to deny. The trial court, therefore, did not err in striking out the defendant's plea in abatement, alleging an agreement by defendant to aid State officers in detecting criminals, etc., nor in refusing to admit evidence in support of the same.

2. SAME.— Note that Willson, Judge, delivering the opinion of the court, calls in question the correctness of the rule laid down in the cases of *Bowden* v. *The State,* 1 Texas Ct. App., 137; *Hardin* v. *The State,* 12 Texas Ct. App., 186, and *Harris* v. *The State,* 15 Texas Ct. App., 629, to the effect that an agreement entered into by the State's attorney and a party charged with crime, that the latter will not be prosecuted if he will turn State's evidence against others charged with him, and that such agreement may be pleaded in bar of the prosecution against the party turning State's evidence, and that if he perform his part of the agreement in good faith, his plea in bar of the prosecution will be sustained. Note the rule relied upon to support the converse of the doctrine. But *held* that, even if the rule as heretofore laid down (*supra*) be correct, it cannot be extended to an agreement looking merely to the co-operation of the accused in the detection of crime.

3. THEFT — EVIDENCE — CHARGE OF THE COURT.— It is competent for the State, in a trial for theft, to prove the theft of other property at the same time and place as the property in question, if such proof conduces to establish identity in developing the *res gestæ,* or to prove the guilt of the accused by circumstances connected with the theft, or to show the intent with which the accused acted with respect to the property for the theft of which he is on trial. See the opinion *in extenso* for evidence *held* admissible against the accused under the rule stated.

4. SAME.— Special instructions are properly refused if the general charge fully and correctly instructs the jury upon all of the issues raised upon the trial.

APPEAL from the District Court of Gonzales. Tried below before the Hon. George McCormick.

The indictment charged the appellant and John Davidson, jointly, with the theft of a horse, the property of Edward Hill, in Gonzales county, Texas, on the 1st day of January, 1873. The appellant being alone upon his trial, was convicted, and his punishment was assessed at a term of five years in the penitentiary.

The defendant's plea in abatement, referred to in the first headnote of this report, set up an agreement between him and Captain J. Lee Hall, commanding the State force of rangers, under which

defendant, in consideration of the dismissal of this case against him (the said Hall to procure the said dismissal), agreed to furnish information for the detection and conviction of a certain gang of horse-thieves. The plea is supported by the affidavit of J. Lee Hall, reciting the agreement and certifying that defendant faithfully performed his agreement, so far as was possible, before his arrest upon this charge. The disposition made of this plea is disclosed in the opinion of the court.

Edward Hill was the first witness for the State. He testified that, after feeding his two horses, a sorrel animal and a dun animal, on the night of January 16, 1873, he turned them out of his lot with an old horse that wore a bell and had the fistula. During the night the witness heard the old horse running, as indicated by the ringing of the bell. The sorrel and dun horses failed to come up as usual on the next morning, and witness went to look for them. He found the old bell-horse near by, but could discover no trace of either of the others. After considerable search throughout the range, witness went to Thompsonville to make inquiries concerning his horses, and from Thompsonville he went to the house of Dock Priest, to ascertain if one Jackson and one Davidson, two strange men who had been staying with Priest for two or three weeks, were still with him. They were gone. Priest, who is now dead, was at home. Finding that Jackson and Davidson were gone, witness returned home and arranged to take a trip "out west" in pursuit of his horses. The witness went as far as old Alfred Mooney's place in Caldwell county, Texas, to which point he traced his horses. Losing "track" of the horses at Mooney's, witness returned home, and employed James Mangum to go west in search of the horses. Three weeks later, Mr. Mangum and Mr. McCallum, deputy sheriff of Bee county, returned the horses to the witness. The sorrel horse mentioned in this indictment was taken from the possession of the witness, without his consent, in Gonzales county, Texas, on the night of January 16, 1873. The dun horse disappeared at the same time, and both were returned to the witness at the same time.

Three or four weeks before the disappearance of the horses, two men, one calling himself Jackson and the other Davidson, came into the neighborhood, and took up quarters at the house of Dock Priest. The man who called himself Jackson was a tall, spare man, with dark hair and eyes. That man Jackson and defendant were one and the same individual. The man who called himself Davidson was a low, heavy set man, with light hair and complexion. The two men, defendant and Davidson, were in the Gonzales county

jail when the witness saw them for the first time after the disappearance of his horses. That was in February, 1873, and the witness then recognized them as the parties who had gone by the names of Jackson and Davidson in the neighborhood. Jackson, in February, 1873, claimed the name of Holmes. Witness had seen the defendant several times since then, and was positive that he was the man who came into the neighborhood under the name of Jackson. Witness saw the defendant and his companion a number of times during their residence in the neighborhood as Jackson and Davidson, and never saw them doing anything but riding about the country. He never saw them apart but once, and that was when Davidson went off alone to get a bottle of whisky. There could be no possible doubt that defendant knew both of the horses, and knew that they belonged to witness. A few days before the disappearance of the animals, the witness, riding his dun horse, chanced to join a party running pony-races. A race was made up between the witness's dun horse and a horse that belonged to Priest. Witness won the race. Defendant, who rode the race on Priest's horse, proffered to purchase the dun horse from the witness after the race, and asked witness what he would take for the animal. Witness told him that the animal was not for sale. A day or two later the witness, on his way to the store and riding his sorrel horse, overtook the defendant and Davidson, and rode a short distance with them. On the way defendant said: "Hill, you have got two d—d good horses. I believe that the horse you are riding is the best saddle animal I ever saw." He then asked if witness would sell him. Witness replied that he would take $100 in money for him. While in the witness's neighborhood, in 1873, the defendant had a light moustasche and a small beard, and appeared to be about nineteen years old. Witness's sorrel horse was branded with a reversed P and E, connected, which was James Speed's horse brand. Speed lived in Atascosa county.

James Mangum testified, for the State, that he first saw the defendant in the Thompsonville neighborhood in Gonzales county, Texas, in January, 1873. He was then in company with one Davidson, a man short and heavy of build, with light hair and complexion. Defendant at that time was going by the name of Jackson. He and Davidson stayed about the Thompsonville neighborhood for several weeks. Before the two left the neighborhood the witness learned that the defendant's true name was Holmes. Witness saw defendant and Davidson splitting rails on one occasion. They then had no horses. Witness at that time lived in the Thompsonville

neighborhood. Witness went to Bee county shortly after the dis-appearance of Hill's horses. Bee county was a hundred miles dis-tant from Thompsonville. Witness's principal object in going to Bee county was to find Hill's horses, if possible. Upon his arrival at the town of Beeville the witness heard of a horse-race that was to be run at a point about ten miles from Beeville. He went to the race, and found Jackson and Davidson on the ground, Jackson (de-fendant) then going under the name of Thomas Holmes. Defend-ant had in his possession Hill's sorrel horse, and the man Davidson had Hill's dun horse in his possession. During the time he was on the ground witness heard several parties offer to buy the sorrel horse from the defendant, and as often heard the defendant refuse to sell him, and later saw and heard defendant stake the sorrel horse on the result of a race. Witness then had defendant and Davidson arrested upon a writ for the theft of Hill's horses, and soon, in company with Deputy Sheriff McCallum of Bee county, started to Gonzales county with the defendant, Davidson and the two horses. Defendant and Davidson effected their escape on the night before Gonzales county was reached, and witness did not see them again until they were re-arrested in February, 1873. After the escape of defendant and Davidson, witness and McCallum took the two horses to Gonzales county and delivered them to Edward Hill. Witness knew both of the horses well. The witness knew that the sorrel horse was in the possession of the defendant in Bee county. He heard the defendant several times on that day refuse to sell the horse, and then heard him propose to bet the horse on the result of the horse-race. That was before the arrest was made, and before the race was run. The race was run some little time after defend-ant and Davidson were arrested. Witness at that time was sixteen years old. Defendant had a moustache, and witness took him to be about twenty years old.

James Collingsworth testified, for the State, that he was mer-chandising at the village of Thompsonville, in Gonzales county, about one and a half miles from Edward Hill's farm, at the time that Hill's two horses disappeared. On the evening preceding the night on which the two horses disappeared, two men calling them-selves Jackson and Davidson, who had been several weeks in the neighborhood, came to witness's store and bought a stake rope. Hill reached witness's store on the next morning, making inquiries about his horses. He left witness's store, going in the direction of Dock Priest's house. It was not an unusual thing for witness to sell stake ropes, and he remembered that particular transaction only

by the names of the men and Hill's call on the next morning, look-
ing for his horses.

J. D. McGee testified, for the State, that he lived on Plum creek,
near the town of Atlanta, in Caldwell county, Texas, during the
year 1872. During that year the defendant came to the witness's
place, on which his brother-in-law was then farming. He remained
with his brother-in-law until his crop was harvested, when his
brother-in-law sold his crop, and the two left together. Witness
did not know where they went to. Defendant then had a mous-
tache, and looked to be about twenty years old. Witness knew the
witness Alfred Mooney. During the years 1872 and 1873, Mooney
lived near Plum creek, on the road leading from Thompsonville, in
Gonzales county, to Prairie Lea, in Caldwell county, about one and
a half miles from witness's place, and about fifteen miles from
Thompsonville.

Alfred Mooney testified, for the State, that the defendant and a
low, heavy-set man, with light hair and complexion, came to his
house one morning on foot, and asked for their breakfast and for
some provender to feed their horses. Witness gave them their
breakfast and sold them some corn for their horses. They came to
witness's house from towards the woods, and when they left they
went back towards the woods, whence they came. On the next day
the witness Hill came to witness's house, looking for horses. Wit-
ness did not see any horses in the possession of the defendant and
his companion, on the occasion of their call at his house. Witness
did not know his exact age, but knew that he was past seventy.
County Attorney Atkinson pointed out the defendant to witness,
and asked him if defendant was one of the men who came to his
house for breakfast and for horse feed on the morning spoken of.
Witness made no reply to Mr. Atkinson, but knew at the time that
the defendant was one of the men. Witness could not see defend-
ant well, when Mr. Atkinson pointed him out. Soon afterwards
District Attorney Spooner asked witness if defendant was one of
the men. Witness was "scared" to say at first, but finally pointed
the defendant out to Mr. Spooner as one of the men. At the last
term of the court some strange man took the witness to the jail to
see if witness would know the defendant. Defendant was then
walking about in the jail yard. Witness recognized him at once
and pointed him out.

The State next read in evidence the three appearance bonds, to-
gether with the judgments *nisi* and the final judgments forfeiting the
bonds of the defendant in this case.

Thomas H. Spooner testified, for the State, that he was deputy district clerk of Gonzales county in 1873. He identified the defendant as one of the men who was arrested in 1873 for the theft of Hill's horses, and confined in the Gonzales county jail upon that charge. Defendant escaped from the Gonzales county jail after his confinement therein. Witness observed that when the witness Alfred Mooney was brought into the court room at this term of the court, for the purpose of ascertaining whether or not he could recognize the defendant, one James Brown, one D. M. Young, one Fagg and one Sheeley, friends of the defendant, who was then sitting in the criminal dock, rushed up to the bar railing, and defendant's brother, J. F. Holmes, took a seat by the defendant, their evident purpose being to obstruct Mooney's view, and to confuse him in his effort to identify the defendant. The witness, observing the purpose of the parties named, quietly removed Mooney to another part of the court room, from which he could obtain an unobstructed view of the defendant, and asked Mooney to point out the man who came to his house for breakfast. Mooney pointed the defendant out as one of the men.

B. R. Abernathy testified, for the State, that he was and for ten years had been district clerk of Gonzales county. Witness had issued many *capiases* for the defendant, but neither the defendant nor his counsel had ever applied to witness for an attachment for a witness named John Wardroop. The records of the office show no attachments to have been issued for such a witness by any of witness's predecessors. In 1882, and again in June, 1885, the defendant caused the issuance of an attachment for a witness under the name of George Crandall. The State closed.

John Wardroop was the first witness for the defense. He testified that he lived in Cooke county, Texas, in 1872, and started on a prospecting tour on the 1st day of January, 1873. Witness passed through the cities of Austin and San Antonio, traveling no particular road, and reached the Leona, about eighty-four miles from Austin, on the eighth or ninth day of his journey. On the night that witness camped on the Leona he bought a sorrel gelding branded with a reversed P and E, connected, from a man who said that his name was Priest. This transaction was at night. Priest executed a bill of sale to the witness. Witness told Priest that his name was Wardroop. Witness left the Leona on the next morning and traveled in a somewhat southerly direction towards Floresville in Wilson county. On the next day after that the witness met two strangers, who gave witness to understand that the sorrel gelding

was stolen property. Witness then determined to get rid of the horse, and adopted the name of George Crandall, and passed under that name during the remainder of his prospecting tour. On the night after he left Floresville the witness camped on Ecleto creek near Helena, and while in that camp a man whom the witness now recognizes as the defendant rode up and asked permission to camp with witness over night. Defendant was then a stranger to witness and looked to be about sixteen years old. Witness traded the sorrel horse to the defendant for a little brown pony, a six-shooter and $25 in money. Witness represented himself to defendant as George Crandall, but gave no bill of sale for the horse. From the Ecleto camp the witness prospected over Atascosa, Frio and Medina counties, looking for a place to locate. Witness remained in that section, prospecting, until in March, when, failing to find a place to suit him, he returned to Cooke county. He remained in Cooke county until 1876, when he removed to Callahan county, where he remained until January, 1879, when he removed to Medina county and tried to make a crop. In the fall of 1879 the witness moved to Frio county, and lived in the same neighborhood with the defendant until the spring of 1885. Witness went under his name of John Wardroop in Medina and Frio counties. The second time that the witness met the defendant was in Medina county. He was then under bail, and had been released from the Gonzales county jail. Witness afterwards lived in the same neighborhood with him for three or four years. Witness and defendant talked over their horse trade during the spring of 1880. Defendant then knew that the witness was the man who traded him the sorrel horse, and knew that the witness's name was Wardroop and not Crandall. Witness had never been attached as a witness in this case. The witness testified as a witness for the defendant in a criminal case several years ago at Cotulla. Witness was now living in Brown county.

James Brown testified, for the defense, that a few days before this trial he saw the county attorney, Mr. Atkinson, bring the State's witness Mooney from the jury room, and point the defendant out to him, with the words: "That is the man."

Mr. Fagg, testifying for the defendant, corroborated the statement of James Brown and admitted that he, Brown, Young and Sheeley crowded around defendant, and that J. F. Holmes sat down by defendant when Mooney was called to identify defendant. Witness's purpose was not to obstruct Mooney's view of defendant, but to test Mooney's ability to identify the defendant in a crowd. The defense closed.

J. T. Long, deputy sheriff of Atascosa county, testified for the State, in rebuttal, that for five or six years he had known John Wardroop's reputation for truth and veracity to be bad. Witness was not summoned to testify as a witness in 'this case, but came from Atascosa county of his own accord, and telegraphed the district attorney from San Antonio that he was coming. Witness's feeling for the defendant was not good.

. James Long, a brother of the last witness, and Jacob Cutcherville testified for the State, in rebuttal, that they were residents of Frio county, and were in attendance as witnesses in this case of their own accord. They knew John Wardroop's reputation for truth and veracity to be very bad.

Young, Fagg, Carver and Sheeley testified for the defense, in rebuttal, that they knew John Wardroop's reputation for truth and veracity, and that it was good. Young stated that he once heard James Long say that Wardroop's reputation for truth and veracity was good. This last statement was denied by James Long, when recalled by the State.

The motion for new trial raised the questions discussed in the opinion.

W. S. Fly, for the appellant.

Assistant Attorney-General Burts, having been of counsel for the appellant, did not appear on the trial in this court.

W. M. Atkinson and O. S. Eaton, for the State.

Willson, Judge. I. There was no error in striking out the special defense pleaded by the defendant, nor in rejecting testimony offered by him in support thereof. No such plea is provided for by our Code, nor have the courts of this State recognized such a plea as valid, either in abatement or in bar of a prosecution. There are but two special pleas provided for by the Code; that is, former conviction and former acquittal, and these, it is declared, are the only special pleas which can be heard for the defendant. (Code Crim. Proc., art. 525.)

. There are two other special pleas, however, which, although not provided for by the statute, are held to be permissible because they are fundamental and beyond the power of the Legislature to deny; they are a plea to the jurisdiction of the court, and a plea of former jeopardy. (*Lott* v. *The State,* 18 Texas Ct. App., 627; *Powell* v. *The*

*State*, 17 Texas Ct. App., 345.) And it has been held by this court that an agreement made by the attorney representing the State, with a party charged with crime, that he will not be prosecuted for such crime if he will testify fully and truthfully all he knows in relation to the guilt of others of the same crime, may be pleaded in bar of a prosecution against such party for said crime, and that such agreement will be a bar to such prosecution if the defendant has in good faith performed his part of the same, or if his performance thereof has been prevented by the State. (*Bowden* v. *The State*, 1 Texas Ct. App., 137; *Hardin* v. *The State*, 12 Texas Ct. App., 186; *Harris* v. *The State*, 15 Texas Ct. App., 629.) In neither of the cases cited is it stated by what authority such a plea was entertained. In Bowden's case it seems to have been regarded by the court as a plea to the jurisdiction. In Hardin's case it is said the plea was interposed "by way of estoppel," and it is conceded in the last named case that "the great weight of authority is to the effect that this plea cannot be interposed, but that the defendant must look to executive clemency." In these cases it seems to have escaped the attention of the court that our Code prescribes the only pleadings which can be entertained, and that such a plea does not come within any provisions of the Code. It is certainly not a plea of former jeopardy, and unless it be a plea to the jurisdiction of the court, as intimated in Bowden's case, it is not such a plea as can be interposed by authority of either the Code or the decisions of the courts.

The writer entertains serious doubts of the correctness of the decisions referred to. He is inclined to the opinion that such a plea cannot be interposed either in abatement or in bar of a prosecution, because it is not so provided by our Code, and is neither jurisdictional or fundamental in its nature. Such matter, in his opinion, can only be addressed to and entertained by the pardoning power. Mr. Bishop says: "Doubtless, in most cases, the mere fact that an accomplice testifies as a witness for the government, freely and fully acknowledging his own participation in the offense, will constitute an implied agreement, in the absence of an express one, for his exemption from further prosecution. But where the testifying was not with the concurrence of the State's attorney, and there was no such understanding with any authorized person, or evidence even of expectation, it was held not to be adequate. The agreement is that the accomplice shall disclose all he knows, honestly and fairly, and, if his testimony is corrupt, or if otherwise his disclosures are only partial, he gains nothing, and his confessions may be used

against him. But when he has fulfilled the agreement on his part, he is equitably entitled to be no further pursued for his own crime, and equally whether the party testified against is convicted or acquitted. He cannot plead this acquired right in bar; and, if the attorney for the State refuses to recognize it, the court will simply continue the cause to permit him to apply to the executive for pardon." (1 Bish. Cr. Proc., § 1164.) In the opinion of the writer the rule above quoted is the true one, and peculiarly so in this State in view of the fact that our Code defines and limits the pleas which may be made by a defendant in a criminal action.

But, even if the Bowden, Hardin and Harris decisions are correct, they are not applicable to, and authoritative in this case. In this case the agreement on the part of the defendant was not to testify in behalf of the State, but it was to perform certain services as a detective or informer; to discover and assist the officers of the law in arresting, etc., certain thieves and violators of the law. We know of no rule of law, and of no decision of any court, and have been cited to none, which would authorize a court in entertaining a plea setting up such an agreement. It would be a dangerous practice to engraft upon the criminal law of this or any other State. This court will not attempt to make such an innovation. If the good faith of the State has been plighted, and the services of a party obtained thereby, it is the province of the executive of the State, in the exercise of its pardoning power, to make good the compact on the part of the State. It is a matter with which the courts have nothing to do.

II. It was not error to permit the State to prove that another horse than the one which defendant is charged with stealing was stolen at the same time and place, and was found in the possession of another person at the same time and place that defendant was found in possession of the one he is accused of stealing. It was proved that this other person and the defendant were together in the neighborhood at the time the horses were stolen; had been companions for some time prior thereto, and left the neighborhood together on the night of the theft, and were found together, a hundred miles distant, in the possession of the two stolen horses, and a short time after the theft. The court properly instructed the jury that they could consider this testimony for the purpose of identifying the theft of which defendant was on trial, or for the purpose of showing the intent of defendant in taking the horse found in his possession, or in making out the guilt of the defendant by a chain of circumstances connected with the crime for

which he was on trial. (*Kelley* v. *The State,* 18 Texas Ct. App., 262.)

We have carefully considered the charge of the court in the light of the objections made to it by counsel for defendant, and, in our opinion, there is no error in it. It presents the law correctly and plainly upon all the issues raised by the evidence, and, such being the case, it was not error to refuse the special instructions requested by the defendant.

The judgment is affirmed.

*Affirmed.*